Case No. 09-4273 Michael Janowiak v. John R. Janowiak Good morning, Your Honors. My name is Richard Lang and I represent Michael Janowiak v. the appellant in this case. In brief, the case involves the sale of Michael Janowiak's stock in a family corporation back to the family of what we allege was a fraudulent and artificially- You'll have 15 minutes per side. Save time for rebuttal if you choose. And the role of the defendant in this appeal was that he was both at the same time the trustee of the trust that held the stock and the personal attorney for the settler, and as such was intimately familiar with the financial affairs of the company. When my client was informed that his stock was to be repurchased and they warned him that it would be at a much lower price than he could expect because of adverse conditions, he went to Mr. Tessie, the defendant, and asked him to assist him in understanding this evaluation. Mr. Tessie knew what was going on in the company and resigned. When you say that, do we know that factually? Well, we don't know anything factually yet, Your Honor, because the case was dismissed on the 2619 motion, and the basis for the dismissal was the release that was signed as an acceptance of office document. And the first thing I wanted to say about the release is to clarify any confusion that there may be about our position in that, because we recognize that the acceptance of office document, which contained the release, was transmitted to my client after the date that Tessie announced his resignation would be effective. He sent a letter on December 8th saying, within 30 days or the acceptance of office, I will resign. He didn't send the acceptance of office, which contained the resignation, nor was it signed and returned until after January 17th when Tessie sent it to my client. We have no idea when it was actually signed, but we do know it was after the 17th, and we do know that that acceptance of office document was transmitted in the January 17th letter. So what I would say is our position in the case is that the relationship continued for the completion of this process of replacing the trustee, and that Tessie continued to hold fiduciary duties to my client. If the court were to find that that, let's say, January 7th, the 30-day date, is a drop-dead cutoff in which all fiduciary duties cease, then we should lose. There's no question about that. We allege, however, that that's not what happened, that there's a continuation until through the signing. And in support of that, factually, the defendants talk a good deal about the trust they created, which I think is a very good starting place, because the trust says that the way for resigning is to give notice to the settlor, notice to the successor trustee, and then not less than 30 days after that, you can resign. So there's a process here that's going to continue for some period of time. When you look at the actual documents in the case, the note, the appointment of my client as successor trustee is done on December 31st. In other words, much after the December 8th letter. So that appointment that he now has to accept, because that's the acceptance of office document, is done on December 31st. That document and the acceptance of office document were created by the defendant in this case, Mr. Chiesi. And that is attached to his letter. The signed document by the settlor is attached to the January 17th letter. It's also attached is a blank acceptance of office, which contains this release language. It's attached to the same letter. If you look at the word processing marks on them, they're created on the same document. So they're created by Mr. Chiesi while he is the trustee. And so what we're saying is this process, envisioned by the trust and supervised and effectuated by Mr. Chiesi, encompasses a process that goes on beyond this January 7th date that encompasses it. And what the position is, when Mr. Chiesi created that acceptance of office, which contained a release, he needed in that document to disclose the conflict, to disclose all material facts to my client, and the document doesn't disclose any of the material facts and therefore should be ineffective. Is your position that the acceptance of office and the release both are effective December 31st simultaneously? They're dated December 31st. Mr. Chiesi's affidavit, and we have no reason to not believe his affidavit, is that while that document is dated December 31st, the document he sent to my client was after January 17th. The document that you're referring to that is signed by my client is not the identical document that Mr. Chiesi sends in his letter. However, that document by Mr. Chiesi is dated 2004. It's just not filled with what date in 2004. The document that comes back is December 31st, 2004, and because of the stage of the case, we have absolutely no idea. Sounds like there's a lot of questions of fact here. There are a lot of questions of fact. And so we believe that the better law that we've cited is that this process of obtaining a release from a fiduciary, the fiduciary relationship continues while they are in the process of, in essence, winding up the relationship. And my client's acceptance of office was part of the winding up of the relationship, and that's why we rely on the Golden case, and there are a couple of other cases. What about the Schmidt case that would take you out of the ballpark? That's a Supreme Court case. Most of the cases cited by both sides here are appellate court cases, but the Schmidt case, and it hasn't been overruled, and I'll just read a little because it doesn't appear you're aware. No. The rule is well established that a party is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts. When he has afforded the opportunity of knowing the truth of the representations, he is charged with knowledge, and if he does not avail himself of the means of knowledge open to him, he is not heard to say he was deceived by misrepresentations. So my question to you is, I don't think he was put on notice when the one gentleman, Teese or whatever his name was, said, I can't tell you because my client, blah, blah, blah. Well, there's notice. At that point, then he has to act like he could have gotten an accounting or he could have sued or done something to get the true facts. He did nothing. Therefore, your argument as to fraud or misrepresentation fails to me because he's wicked. Well, that's not part of the release, and I am familiar with that case, and what I would say is that's part of the cause of the cause argument that he raised, which is always a question of fact, and we really haven't gotten to any facts in the case. The fact of the matter is this is an inevitable. Yes, but if fraud is waived, there's no basis to send it back. Well, but I would say that's a factual determination. Did he really have the opportunity? And in the complaint, we say that he didn't have the opportunity because he was denying access. Did he really believe that? Actually, I do because his accountant tried to get the financial records and was denied access, and then a number of months later, three months or so, this report comes out from Friedman and Associates, and then that starts the ball rolling about is this true or is it not true, but at this nascent stage, this very early stage where he is simply warned, what you think is not going to happen, this is very low. He doesn't really have much information. He is not privy to the financial information because he's been shut out of the company for a period of time. But he was a party. He was a trustee the whole time. He wasn't a trustee the whole time. He only became a trustee after the resignation of Mr. Tiessy. But he was involved. Well, he was a beneficiary. He wasn't involved in the running of the company. Beneficiary of the trust. Yes, he was a beneficiary of the trust, but not in the running of the company. He didn't have access to that information. That's why he went to Tiessy. So we'd say that's a question of fact, whether that occurred or not. I understand what you're referring to now, though. And with that, I would simply rely on our views. Okay. Thank you. And who do we have there? Is this Diane? Yes, Your Honor. Diane Klotnia. Okay. On the Council table is Michael Schaffman, my partner. We represent Angela Tiessy, the defendant, at the limits case. I don't like to start off by saying I'm always surprised by my opposing counsel's arguments, but I'm never quite sure where the arguments are going to go. Mr. Janowak, until this morning, throughout this appeal, has taken the position that the release that is the subject of this appeal had never been presented to him, his client, until it had not been presented during the time of the fiduciary relationship, before Mr. Tiessy had resigned. Now, if I understand his argument this morning, he is waiving that. He is agreeing, as I think the record is quite clear, that the release was not presented to Mr. Janowak until January 17, 2005, which is after Mr. Tiessy had resigned. In light of this, I'd like to address what really are not facts in dispute. I think one of the questions was raised whether there are lots of issues, facts in dispute in this case. There are not lots of facts in dispute in this case. There is no dispute that Mr. Tiessy tendered his resignation to Mr. Janowak and to his father, the settler of the trust, on December 8, 2004. There's no dispute that that resignation was effective by no later than January 7, 2005. There's no dispute now that on January 17, 2005, after Mr. Tiessy had resigned, he presented for the first time a release to Mr. Janowak for Mr. Janowak's signature. And there's no dispute that sometime after January 17, 2005, Mr. Janowak signed that release. And that release, if I can quote for the court, is very broad, but it's also very specific. It says, I, referring to Michael Janowak, do hereby release, hold harmless, and indemnify Angelo F. Tiessy, his heirs and assigned, from any and all liability relating to his act or failure to act as trustee of the Michael H. Janowak Trust. Mr. Janowak signed that release, and he signed it at a time that he knew, he knew based on his own allegation that Mr. Tiessy had, when Mr. Janowak came to him and said to him, I'm concerned about a poor prospect of PEI. I'm about to sell my shares to my father. Give me some information about PEI. Mr. Tiessy, according to Mr. Janowak, didn't say, didn't remain silent. He said, no, I will not give you any information about PEI. I have a conflict. I represent your father. And then rather than provide any information, he resigned. Well, is there a conflict about why he actually resigned? Is there a conflict? Is there absolute agreement as to the circumstances that prompted him to resign, namely whether it was a conflict because of doing some personal business, which I assume he had had for quite some time, or information that he had about the actual financial health of the corporation? You know, Your Honor, he alleged that Mr. Tiessy didn't disclose to him all the reasons that he was resigning. He said in his complaint that Mr. Tiessy told him he was resigning because of a conflict because he represented the father, but he did not tell him that he had information about the company. Now, for purposes of this motion, we're not disputing that allegation, but he was on notice at the same time that Mr. Tiessy had told him, I'm not giving you any information about the company. So whether Mr. Tiessy said or didn't say, I'm resigning because of a conflict and I'm not giving you information, that's why I'm resigning, it's really immaterial because he told him, I'm not giving you information. Wasn't there a big difference between what he got for his shares versus what the shares may have been worth? Wasn't there information about that, that there was more than $1 million of difference? Well, the allegations in the complaint are that the appraisal report, which was issued five months after Mr. Tiessy had resigned as trustee, that the appraisal report undervalued the shares by $4 million. That's during a time that Mr. Tiessy owed no obligations to Mr. Janowick and there's no allegation that Mr. Tiessy was involved in that report at all. No, but I think there is an allegation that he was in possession of information that might have been consistent with that ultimate finding. Well, the allegation in the complaint is that Mr. Tiessy owed him information. Mr. Tiessy was the trustee of a trust that held shares in PEI. So in that sense, he was essentially standing in the place of a shareholder who had whatever rights a shareholder has to information. Mr. Janowick was also a shareholder at that time. Mr. Janowick individually owned 900 shares of PEI at all relevant times. So whatever rights Mr. Tiessy had to access information as a shareholder trustee of PEI, Mr. Janowick had access to that same information. So they're equivalent in your mind, the trustee and the beneficiary? In terms of their... In terms of duties and knowledge and responsibilities? In terms of the right to access information. Okay. In their role as shareholders, they were both shareholders. Now, after Mr. Tiessy resigned at the end of January 7th, the sale didn't take place for another six months. And most of the conduct that Mr. Janowick alleges formed the basis for his loss, he points to conduct of others, not to Mr. Tiessy. And it all occurred after Mr. Tiessy had resigned. And during that period of time, Mr. Janowick was a trustee of his own trust. Mr. Janowick was a shareholder in his own right. And Mr. Janowick had his own accountant to review the appraisal report that his father, Robert, obtained to value the shares. Not Mr. Tiessy. Robert obtained it. And it's that valuation report that Mr. Janowick now says undervalued his shares. And it's that report that Mr. Janowick says in his complaint that his accountant asked Robert or John for more information about the value set forth in this May 5th, May 2005 report. And Mr. Janowick again says, they stonewalled him. They said, Robert wouldn't, I couldn't give you information without getting permission from Robert. Robert doesn't get the information. So Mr. Janowick now in May, based on his own allegations, says I wasn't getting information that I thought I needed to determine the true value of my shares. And what does he do? He went ahead and sold his shares anyway. So based on those allegations, and that again is all conduct that occurred after Mr. Tiessy had resigned. All during the time that Mr. Janowick, not Mr. Tiessy, Mr. Janowick was trusting. Mr. Janowick, the shareholder, Mr. Janowick had whatever rights he had as a shareholder to access information concerning the company, he had that right. And he had the right not to sell his shares. He could have chosen when he was stonewalled, as he says, in obtaining information, he could have chosen not to sell his shares. Instead, he went ahead with the sale of the shares. What duty does Mr. Janowick have, if they have the same right to access for information, but he's trying to get information from Mr. Tiessy, what duty does he have to do at that point in time? Since, as you say, they're equal in terms of their right to access information. If he wants information from the other guy, how does he get it? What does he have to do? If Mr. Tiessy wants information? No, no. I'm sorry. That's fine. There's some confusion here. If Mr. Janowick, the plaintiff in this case, and Mr. Tiessy, as you say, are equal in terms of their ability to get information as trustee and as beneficiary, how does Mr. Janowick, as the beneficiary, get information that Mr. Tiessy doesn't want to give him? What duty does he have to fulfill? As a shareholder, I believe he has rights to access the books and records of the company. Those books and records that Mr. Janowick, even in his own allegations, say would have revealed that the shares are undervalued. Some of the transactions that he complains about don't involve Mr. Tiessy. I think that's important to note. They involve his brother, his father. They don't involve Mr. Tiessy. But those transactions should have been available from the agreements that were entered into and the books and records of the company. And as a shareholder, he could have accessed that information. But the other important question is to Mr. Tiessy, whether he owed or breached a duty to Mr. Janowick during the time that he was trustee, that breach was waived. It was released. Mr. Janowick, with notice of all these things that he claims were breaches of duties that Mr. Tiessy had engaged in, and we dispute that he allegedly engaged in them, at the time that he was aware of all those duties and all those alleged breaches, he nonetheless signed a release that waived all liability for Mr. Tiessy, which we set to those very same claims that he said constituted breaches of his fiduciary duty. Having done that, at a time that Mr. Janowick did not owe him any fiduciary duties, that release is effective and it bars his claims. Now, I'd like to point out two things. He raises this notion of a continuing fiduciary obligation, even after resignation, during what he calls the windup. There are no cases to support that. The case that he relies on is the partnership case. It involves the Illinois Uniform Partnership Act. There's no similar duty that's imposed under the Trustee and Trustees Act. There's no similar duty that's imposed under the governing trust document. And, in fact, those documents provide that upon resignation, he is discharged from and of the trust. So once he resigns and that resignation became effective and is undisputed on January 7, 2005, Mr. Tiessy owed him no further duties. He owed him no duties in connection with the acceptance of the office. He owed him no duties in connection with the release. Your position is that there was a general release that released Tiessy from failure to act with regard to his duties as trustee. In the Fuller family case, I believe the holding was, was that you cannot say that failure to act as trustee encompasses a breach of fiduciary and fraud claims. That's what the case seems to stand for. How do you respond to that? Well, Your Honor, in Thornwood, in the Thornwood case, that case involved a release, a breach of fiduciary duty, and involved a release related to the property. First, you think it's a specific release. It releases, as the trial court found, his act as trustee, and the only act he has as trustee are breaches of fiduciary duty. And if you read the release in the context of what was happening at the time based on the allegations of the complaint, that Mr. Janowak, as he alleges, was aware of all the facts that he claims now formed a breach of fiduciary duty. So the time he signs the release, releasing Mr. Tiessy for his acts or failures to act, the failures that he alleges he was aware of was Mr. Tiessy's failure to provide enough information that he says he was entitled to. So we think the release, in the Thornwood case, one of the points I wanted to make about the Thornwood case, is that you don't have to list all the specific types of claims that are released. In Thornwood, they found that even though the claims, even though the release didn't refer to a fraud claim, I think it was an aiding and abetting breach of fiduciary duty claim, the court found that the release, based on the circumstances and the language of the release, it was broad enough to encompass both of those claims. And one other point on the release, Mr. Janowak, in his, we pointed this out in our response brief, Mr. Janowak is not claiming that the release does not cover his fraud claim. He does not, he is not arguing that on appeal. We noted that in our response brief, and he did not disagree with that. He did not dispute that in his reply. So the only question before the court is whether the release, if it's valid, encompasses a breach of fiduciary duty claim, and I think it quite clearly does do so. I think we've touched on the claim that he was fraudulently induced. It's set forth in our brief. If you have any questions, further questions on that, I'm happy to address them. We also, for the reasons that we've already discussed and the reasons in our brief, we think that the release that Mr. Janowak signed, that he signed, after the fiduciary relationship had ended under McCormick, that releases Mr. Tiasi from any liability, as the trial court found. Would you agree that one of the pieces of knowledge that Janowak had when he signed the release was that Tiasi was resigning from his role as the trustee only because of a conflict in representing the elder Janowak in some personal business? Well, he alleges that Mr. Tiasi resigned both because he had a conflict and because he had information that he wasn't going to share with Mr. Janowak, but it's hard to say that he wasn't aware of both. He knew both of those pieces of information. But because of his relationship to the trust, did he have to disclose it because he had a duty to the father? Or am I...you may not want to answer that. Well, I can tell you that under the allegations of the complaint, he resigned because he said he had a conflict. And the issue of whether Mr. Janowak's allegations are sufficient to constitute a breach of fiduciary duty, the trial court didn't have to reach those, and we suggest that this court doesn't have to either because we are working on the release. And whatever breaches Mr. Tiasi, Mr. Janowak alleges... Well, you can understand why he'd sign it. I mean, the trustee's telling him, I have a conflict with your dad and, you know, doesn't give him any other information. And at the same time, he'd have to think that his dad and his brother were out together. So, of course, he would sign it. Well, of course, Mr. Janowak would sign the release. Well, Mr. Janowak, the other piece of information that Mr. Janowak had is not simply that he is resigning because of a conflict. He certainly alleged that he had that information. He also knew that he had been told by someone that there were poor prospects for PEI, and I think Mr. Lang said today he was told there were poor prospects for PEI, which affected the value of his shares. And because of that, he went to Mr. Tiasi and asked him for information. The other thing he knew was that there was something going on with PEI, that someone was telling him the shares were less than what he thought they should be, and he went to Mr. Janowak and he went to Mr. Tiasi and he asked for information, and Mr. Tiasi said, I'm not going to give you any information. So, in light of all that, that's exactly the same point. That's exactly the same factual basis that he said, now forms the basis for his breach of fiduciary duty, and he signed a release. I know, but I'm not going to tell you I've got a conflict with your dad, but here's a release signing. Is that a trustee fulfilling his fiduciary duties? I think the important part in that is the timing, Your Honor. You've collapsed both the allegations of when he resigned. I probably did. I understand they're separate. And that's important. It is important that Mr. Tiasi didn't ask for a release until after he had resigned. So, after the effective date, at a time under McCormick, McCormick makes it clear that at that time he owed no fiduciary duties. A case that Mr. Janowak takes in his brief library is Williams, which is a Seventh Circuit case applying McCormick. And Williams addressed the situation where there had been a termination of the fiduciary relationship between an employer and an employee. After that relationship had ended, they entered into a release, and the employer later discovered that the employee had been competing improperly with him during the terms of the employment. And the court said, first, you owe, you, the former employee, owe no fiduciary duties at the time you signed the release because the relationship had ended. And secondly, because of that, you had no duty to disclose to the employer that you had been breaching your fiduciary duties during the relationship. And the release was effective. The court has no further questions. I think that's it. Thank you very much. Thank you. I'll just rush through this. Yes, TSA had a fiduciary duty to Mr. Janowak to disclose all material information he knew because he was the trustee of Michael Janowak's trust. So his relationship with Michael Janowak was as trustee to beneficiary. He had that fiduciary duty. No, Michael Janowak did not know all material facts at the time he signed the release, and it's alleged in the complaint he didn't know at that time of the fraud scheme. He didn't know that TSA knew of the fraud scheme. He didn't know that TSA was withholding material facts from him. All he knew was that TSA had told him that he had a conflict, and he did know that TSA refused to disclose information to him, but that was because he was told he had this conflict. Also, I think the reading of Thornwood is way too broad by the defendants in this case because Thornwood says, however, if those acts were concealed, the release may not prevent the claims, and that's what we're talking about here. It's not Thornwood. And I think that McCormick, it's as if the courts, and actually there's been very little decided on this issue of if there is a winding up type of thing, if there's a continuation of the breach of fiduciary duty, and the cases cited by the defendants actually don't even discuss that issue. They just say the release was after he ceased being a fiduciary. They don't talk about the circumstances of why that occurred, and I'd agree with that proposition, but I just don't think it applies here. I think this is very definitely a winding up because TSA was in control of this winding up stage. He authored the documents. He promulgated everything, and I'm not saying this happened, and if he thought I can just wait 14 days and I don't have any more liability, I've prepared everything, I don't think that that should be the standard for a trustee. Isn't winding up a term of art that is applicable to partnership? I don't know that it's only applicable to a partnership. I understand how you can make an argument that they're factually similar, but in terms of art and the legal principles, isn't that something that is strictly related to partnership? I don't know that it's strictly related, Your Honor, and in the partnership case that you're talking about, which I believe is the Dolan case, they cite Fox Valley, and the rationale is the same thing, and the rationale given in Fox Valley is the need to prevent a fiduciary from taking improper advantage of the dislocation upon the ending of a confidential relationship requires that fiduciary principles be observed so long as the relationship continues, and we think that this relationship continues through the process of securing a successor trustee. And the final thing, just a very minor factual thing, but it relates back to this trust document. Counsel said that Mr. Chessie had communicated in this December 8th letter to both the settlor and to my client. He didn't communicate to the settlor, at least in the December 8th letter we have. It was addressed to my client, who at that time was not the successor trustee. He was just the beneficiary, and the trust says 30 days from the time you communicate to the settlor and the successor trustee, which just indicates that this is a process that goes on for some time to secure a successor trustee. The matter will be taken under advisement. Thank you very much. Well, thank you both. Your presentations were very informative. Yeah, very well done. Thank you. What do you call the next case? Case number 091862, Nancy Lorenzo v. Capital and Deputy Court. Good morning, Your Honor. Good morning. Could you please report? Yes. Counsel, for the defendant appellant, Capital and Deputy Corporation, Robert Chemmers, the president of Stauffer. Your Honor, if I may, I would like to reserve five minutes for rebuttal. What is your name, Counsel? Robert Chemmers. Chemmers? Yeah, Chemmers. Your Honor, it has long been the law in Illinois that an ambiguity in a policy is construed against an insurance company. The reason for it is the carrier drafted the policy, there's an imbalance in power between the typical insurer and the typical insurer, hence the concept, the ancient concept, in fact, so ancient it has a Latin name, the doctrine of contra preferentia, that where there's an ambiguity, it is construed against the insurer. It drafted the document. Now, here, the trial court found the policy my client issued to the defendant at restaurant to be unambiguous. The trial court not only found the policy to be unambiguous, but that the plaintiff's allegations as to where the injury took place should be excluded by the policy. This was a policy issued to Persian Foods Incorporated doing business at Risa's Restaurant. Risa's Restaurant in May of 2006, at the time the court claimed it, became ill from chicken, had 15 scheduled locations on the policy. The location where Nancy Lorenzo purchased and consumed chicken was not listed on the policy. So we have a situation where not only did the trial court find the policy unambiguous, the trial court at page four of its order found that the policy limits coverage to the premises listed in the schedule, and the schedule had 15 locations. And the schedule did not show the location where the tort plaintiff was injured. Having found the policy to be unambiguous, and having found the schedule to be controlling, we submit the trial court should have stopped. And we suggest that when this court conducts its de novo review of the summary judgment entered for Nancy Lorenzo, that it too stop. It needs to stop, and your honors need to stop, for the reason that the law in Illinois should not be that an ambiguity in a tort plaintiff's complaint is construed against the insurance company, and that is exactly what the trial court here found. A new standard has emerged which will turn Illinois insurance law on its head if a vagary of a complaint will cause an insurance company to be saddled with a duty to defend. The ambiguity in a complaint should not trigger insurance coverage. In this complaint, which is relatively simple, it is alleged that Risas was engaged in the preparation, production, and processing of certain foods, including chicken, for consumption at a certain restaurant known as Risas, located at 40 North Tower Road in Oak Brook, Illinois. So you're saying that should be the limit of the parameter. That is correct. It would be very different if that opening paragraph of this lawsuit alleged that at all times here in relevant, Risas was engaged in the preparation, production, and processing of certain foods, including chicken, for consumption at its various locations in the Chicago area. As if they had done it at their Ontario facility. Including the location Nancy Lorenzo was injured at. Just one question that I don't see anywhere. Obviously, there were certain locations where it was processed and certain locations where it was a restaurant. But we don't know that. What we know... We don't know at all. I mean, I would have thought that that would have come up. Well, if you look at the 15 scheduled locations on this policy, one's an apartment building, one's a parking lot. I don't know what every one is. Now, you have a defendant who was defaulted in the tort case. Judgment of $100,000 is entered. A lawsuit gets filed by the tort plaintiff judgment predator against the insurance company saying you owe this money, you wrongfully disclaimed coverage. In the coverage case, a request to admit is sent to the defendant, Persian Foods DBA Risas, asking where they did various things and to admit these facts. And a request was also sent to my client saying, you don't know anything about this. You have no first-hand knowledge of what your insurer did. Which, of course, is true. Now, the reason I say it doesn't matter, the trial court didn't consider it. His order is clear. He looked at the policy correctly. He looked at the complaint correctly. But he went too far. The trial court went too far and held, at page 710 of the record, even crediting capital's interpretation of the underlying complaint. The scope of that complaint remains ambiguous at best. Then he cites the Supreme Court decision in Wilkin, which was a case 20 years ago that held asbestos is not property damage. That when you put asbestos in a building, that's not property damage. For the proposition, and he quotes it, a provision is ambiguous if it is subject to more than one reasonable interpretation. Well, sure, a provision in a policy of insurance is, but not an allegation in a tort plaintiff's complaint. And if it is, how is that construed against the insurance company? Most of the allegations here are clear. Paragraph 2 puts the preparation, production, and processing of foods, including chicken, for consumption only at one location, Ford and North Tower Road in Oak Grove. In paragraph 2, on and prior to March 28, 2006. Well, on and prior is temporal. It's not geographic. Reasons did process, prepare, distribute, sell, and or otherwise place into the stream of commerce certain foods, including a family-style platter, which included chicken, were purchased by the consuming public. So basically you're saying that a designated premise policy should be limited to specific premise, and it is a different state. Well, my problem is all the cases cited by both sides, none of them are designated premise cases. My gut reaction is since a designated premise situation is different, that there's a different standard than all these cases are alleging. My gut is it's a higher standard and a more limited specific standard, meaning that you have to allege one of those specific places rather than pie in the sky as the complaint did here. Your Honor, we cited page 21 of our brief, Cobbins v. General Accident, which is a Supreme Court designated premises case. U.S. Fire v. Schnappenberg, which is a Supreme Court designated premise. In fact, I think we cited all of the designated premises cases, at least three from our Supreme Court. You can't necessarily tell from, you know. And they are clear. They are clear. If the injury does not occur on the premises that is specifically covered, there is no coverage. And that's how this policy was written. Fifteen scheduled locations. I'm not disagreeing. I want you to pull that out. The location where this woman was injured was actually added to the policy in May when the policy was renewed. But at the time, it was not the scheduled location. And the policy is clear. And the trial court so found that the location was not excludable. What the trial court did is it worked backward. When the policy was put before it and saw there were 15 locations, the trial court took the position that the scope of the complaint remained ambiguous after it was learned that Persian Foods maintained at least 14 other business locations. Well, so what? It wouldn't matter if they had one other location or 114 other locations. The location where she was hurt, the only one she alleged was not covered. And the trial court so found it's not covered and the policy is clear and unambiguous, which means the analysis should have stopped. If this court recognizes that a duty to defend is determined based on a vagary of a court plaintiff's complaint or a pleader's inexactitude of description, the law in Illinois will be turned on its head. There will be no clarity, logic, or consistency in the law until this case. It has been relatively clear to determine if there's a duty to defend. And the intuitive counterpoint to this case is Chandler v. Doherty out of the Fourth District from 1998. There, an auto accident occurs and the defendant, the individual who became a defendant, owned two cars, one he insured, one he did not. The one he did not insure was a kit car. It was an old Volkswagen chassis, an engine, and on it was a fiberglass body to make it look like a 1927 Bugatti sports car. He drove it in parades and on nice days. Couldn't be insured. And it wasn't insured. Pass this accident, reports the accident, he goes, you know, I was driving the kit car, I know it's not insured, I wanted to let you know. The agent said it's not covered. The insurance company knew it was not covered. The lawsuit gets filed. The lawsuit by Verna Chandler didn't allege Otis Doherty was driving his kit car. It alleged he was then and there driving his motor vehicle. Now, the insurance company said, Otis, you're not covered. We don't insure the car you drove. The agent told him that and he knew that. However, the court held, you can't tell from the face of the complaint what car he was driving. It was his motor vehicle. It didn't allege he was driving the 1961 Volkswagen, 1927 Bugatti replica car. And true but unpleaded facts known to an insurance company cannot be used as a basis to deny coverage. The carrier was stuck. The Fourth District held that under those circumstances where it alleged his motor vehicle, and you can't tell which car he's driving, there was a duty to defend. Because there was no defense provided, it was in garnishment, the carrier was stopped. That's not this case. This case alleges, I got sick. I got sick of chicken I bought at 40 North Tower Road. When you look at the policy, it's not covered. It couldn't be cleared. You have that case saying the allegations are vague. Well, they were purposely vague. These allegations are specific. She alleges where she was injured. She alleges where she purchased the chicken. The allegations of distribution, processing, selling, storage, warehousing, all go to, on the face of this complaint, a reader knowing nothing more about this lawsuit than what's alleged, would say this occurred at 40 North Tower Road. There is no allegation in this complaint that would cause the reader to believe that Risa's restaurant, A, had more than one location, or that, B, any of these things in connection with the chicken this woman ate in March of 2006 occurred anywhere other than 40 North Tower Road, which is unmistakably excluded by this policy. Counsel, in this case, the insurance company decided to proceed without a reservation of rights or a declaratory judgment in the underlying tort case, and you recognize in your brief that that's a risk that they run, given that they potentially could be on the hook for a default judgment. Correct. So you, as their lawyer here, are stuck with that decision. And in your argument, are you also telling us that your colleague on the other side is stuck with the complaint as drafted that got him the default judgment? Justice Levin, fortunately, it was not my advice that led to that disclaimer. This got to me afterward. If you make your clients too smart, then they don't need you. You would think that the insurance industry, having read Chandler v. Doherty, which I lost in 1998 and wound up winning in 2000 and in 2007, there were three published opinions in that case, you think they'd catch on. In Illinois, you can have a justified refusal to defend. A carrier is in a disclaimer position when it has an unjustified refusal to defend. That is, when you read the complaint, the allegations within the four corners of the complaint, in light of the four corners of the policy, there is a duty to defend. And you refuse to defend, no reservation, no declaratory judgment, that's an unjustified refusal to defend. However, when you read this complaint, where it speaks to only one location, and you look at the policy and the location that is alleged, is excluded, then it's a justified refusal to defend. There is no estoppel contrary to what the trial court found. Here, there shouldn't be an estoppel in any event, for the reason that there was active litigation of the coverage issue once the suit was initiated by Nancy Lorenzo. In Illinois courts of health, it no longer matters who's the first in the courthouse. As long as an insurer, even in a disclaiming position, fights its coverage position, there's no estoppel. Now, on the face of this complaint, there is only one location involved, and you can't look at the policy and say, well, what about these other 15? Well, maybe something happened there. That's what the trial court did here, based on the persuasiveness of counsel for Nancy Lorenzo, and that's wrong. That's not part of the analysis. You look at the allegations of the complaint, not the what-ifs. The allegations in this complaint solely speak to one location. There's not even a basis to argue that some other location is involved. Now, there are other things about this appeal which I want to point out. Number one, the plaintiff here is asking this court for attorney's fees, apparently under Section 155, but admits at page 34 of her brief she didn't ask for it in the trial court. That's out. Number two, the plaintiff here is contesting interest, and there's no cost appeal. And the plaintiff goes so far as to ask this court, the plaintiff states statute's involved, it states the cost statute, the interest statute. There's no cost appeal. There's no notice of appeal filed by Nancy Lorenzo. The entire argument, pages 32 and 33 of the brief of affiliate, should be rejected by this court. This court cannot be asked for the first time what the trial court meant by the last line of its ruling in connection with cost and interest. If that's a question, Lorenzo should have placed it before the trial court by a motion to clarify, but didn't. And if she wants it before this court, she needs a notice of appeal. That's not before this court. So there's no escapement. There's no basis for attorney's fees. There's no basis to enter any decision with respect to interest and cost because there's no cost appeal. And when de novo review is done properly, when this complaint is examined in the light of a policy, it is unmistakably clear that there is no duty to defend it. So we ask this court to reverse and enter judgment for the insurance company. Thank you. Thank you. Good morning, Your Honors. May it please the court, my name is Richard Frank and I represent Nancy Lorenzo in this appeal. And this appeal, the issue here for the court to resolve, is whether a duty to defend arose when capitals insured tendered the defense in August of 2007. Resolution of that issue will resolve all the remaining issues like the dominoes because we know a number of things, but one thing that is crystal clear is that capital did not defend the underlying lawsuit. And that was either okay because it didn't have to or that was a breach of its duty to defend. And Illinois law is clear what happens in the latter instance. The insurance company is held responsible for the underlying judgment. So once this is on the court, besides whether there was a duty to defend, everything else will resolve itself from that decision. And whether there was a duty to defend or discerning whether there was a duty to defend, a number of key principles should be kept in mind. First, any doubts or inferences need to be construed liberally in favor of the hearing. Doubts about what? Doubts about the language of the policy or doubts about the complaint of the plaintiff? I would say both. Can you give us a case that says that the law suggests that we have to resolve doubts in the drafting of your complaint against the insurance company? Sure. Chandler v. Doherty. In Chandler, the plaintiff and defendant were in a car accident and the defendant was driving his Volkswagen and everybody knew, the plaintiff, the defendant, the insurance company, everybody knew that he was driving the Volkswagen and everybody knew that... That's an appellate court case, right? Correct. That's from the Fourth District. Correct. Well, that's unique. It's Goldstein or Gold, whatever his name is. Okay. Golding, yeah. He was fifth. He was president. Maybe it was fifth. No, it was the Fourth District case, I believe. No, it was his father. Whatever. But everybody knew that it was the Volkswagen and everybody knew that that was not insured, but the allegation wasn't he was driving his Volkswagen. The allegation was he was driving his motor vehicle and that was enough to raise the duty to defend because that ambiguity... I wouldn't even say it was an ambiguity. So they were unjustified in their refusal to defend. Correct. And if it had gone even just a bit further, that would have resolved itself because there's the duty to defend, of course, and a separate duty to indemnify, and those are distinct duties held by the insurance company. I mean, a lot of things could have been clarified if the case proceeded to discovery, including the fact that the case belonged in DuPage County because this restaurant is located in DuPage County, even though you pled that it was a cook. Well... Isn't that correct? Do you know? No. The lab... I think Oak Brook was in DuPage County. Right. But if you look at the complaint, paragraph three of both counts, it's a two-count complaint. Paragraph three references not only March 28, 2006, but days prior, times prior. It's open-ended. And it references not just the transaction of here's some tainted chicken. It references a whole slew of putting this chicken into the stream of commerce. You know, counsel, with all due respect, I've read the complaint. I have the complaint right here in front of me, and I'm at a loss to try to find an allegation in this complaint specifically that said that the food that the plaintiff got sick on was prepared elsewhere or was distributed from another location. I mean, the temporal issue, as you point out, is there, but we're talking about geography and premises and location here, and my question is where in this complaint, what number paragraph, what subparagraph, do you allege that this food that got her sick was prepared elsewhere or distributed from another location? Well, another location, the precise location is not referenced in the complaint. That is correct. But in paragraph three of both counts, the allegation is that Reza's on March 28th and prior to that date did a number of negligent acts and or omissions. Where? Where, counsel? I think what we're looking at and what the trial court was looking at was a situation where if you've got a chain of restaurants and there are 15 of them and you forget to insure one of them, unless you specifically allege that one of the other locations was involved in how this woman got sick in DuPage County, why would the insurance company have a duty to defend, number one? Why would the restaurant ever insure all of their locations? Why would they just insure one and then the insurance company is on the hook for all of them? I will answer that question because it's a good question and here is the answer. The reason a restaurant would insure everything is because the duty to defend gets you a lawyer to file an answer and defend you. But when you lose the case, if you haven't listed the other places, that judgment is coming out of your pocket because there will be no duty to indemnify. And the duty to indemnify is the key thing because lawyer's fees are expensive but not nearly as expensive as lost judgments. So why would an insurance company look at this complaint and at least defend it? Because the allegations are broad and you can certainly reasonably read and especially when the inferences are resolved in favor of the Mrs. Lorenzo and it's read liberally and construed in favor of her, you can read that the distribution occurred at... From where? Well, and I think this goes... The locations are not identified. Correct. But... So other than speculation, you have the temporal issue down. On and before. Okay. Conceded. The question is, how is the insurer to look at this and think that this involves food that's prepared anywhere else other than this restaurant in DuPage County? Because of the temporal issue. Because food is not warehoused at this location. It is not processed at this location. It is not stored at this location. It is not manufactured at this location. They don't store food in their restaurant? Perhaps. But it is also stored outside that. And if the facts would ultimately lead to the determination that all of these things were done at this location or if the only things that I could tie up, proximate cause, occurred at this location. For instance, they manufactured or warehoused it on Clark Street location, but they did nothing wrong. And as discovery goes along, I learn that all of the bad acts occurred at this particular location. Well, then, there's no duty to indemnify. But none of that ever came to pass because there wasn't a lick of discovery here. You got a default judgment and then two weeks before the statute ran, you got an assignment from the defendant. Right. There's no discovery one way or the other. Well, I think that lends itself actually in favor of the plaintiff. And here's why. Because the concern here is I've identified a series of bad acts, but I haven't identified the particular locations. Well, a plaintiff who is at the pleading stage, preparing a complaint, won't necessarily know the location where it was manufactured or processed. That's why if we did know that stuff, then we wouldn't have to have discovered it. It's your complaint that got you your default judgment. The insurance company took a risk and said, we're not going to defend this one. It's for a restaurant that we don't have on our schedule. And they have a risk of maybe they're going to get hammered for that default judgment down the road. Right. You take the risk if you're wedded, if this complaint is wedded to the default judgment, that that's the decision, that's the document, rather, that's going to be involved in construing whether or not the policy applies. This is not your third or fourth amended complaint that might have come to pass after you learned more information and you could establish that maybe some of the food came from elsewhere. This is the complaint, the only one that we have to deal with. Right. And in this one, nowhere within it do you make the allegation that the food was prepared elsewhere or distributed elsewhere, and I think that's a problem for you. Well, but also, in the complaint, I nowhere say that it was processed in Oakland, and I nowhere say it was distributed in Oakland. Paragraph 3 does not limit itself to location. It says, on and prior to, Reza did these things. That's all it says. You're saying that helps you. I think that hurts you. Well, it would help if it said in Paragraph 3 and then Paragraph 5 of Count 2, and if you look at Paragraph 5 of Count 2, it's even broader. If you look at Paragraph 5 of Count 2, again, there's a whole host of bad acts. It's now concentrating. It says, at all relevant times. At the times referenced, it's now concentrating in all the acts that placed this food product into the stream of commerce, and it doesn't limit itself to a location. It doesn't. By not admitting, by omitting it, it doesn't mean that it's not limited. You just didn't address it at all. You didn't address location at all, and you're trying to get coverage in this case from other locations, and there's nothing in the complaint about locations other than the location in Oak Brook, which didn't have coverage. Where the penultimate transaction occurred, the last act occurred when she got sick. The second last is where the chicken left Reza's possession and entered into Lorenzo's, but the acts before that, in fact, if I had been able to go to trial on this, if someone had stepped up and defended against this, I might have proved that there was a model of cleanliness in Oak Brook, but that a week prior, they stored it at too high a temperature, or when they delivered it to it on the truck from Clark Street in Cook County to DePage County, that they didn't refrigerate the truck. I might have proved those facts, and if I proved those facts and nothing else, and if they were able to establish, oh, but in Oak Brook, it was kept at 38 degrees, and we all washed our hands, and we distributed no problems, nothing wrong done in Oak Brook, I still would have been able to prevail on this complaint. I wouldn't have had to amend it. I would have been able to prevail, because the allegations are that they did these bad things on and prior to, and in all these different ways. Your complaint, to use the trite phrase of the day, it is what it is, and there's nothing in there about location other than 40 North Tower Road. It is what it is. It is what it is. It does not limit it, and it does not identify it. Absolutely correct. I would submit to the court that a complaint that does not limit it and does not identify it, the same way a complaint that does not limit his motor vehicle and does not identify his motor vehicle, is construed in favor of coverage, because that's what all the cases say. All the cases say that we construe these things in favor of coverage, and it's not difficult to come up with that. In my conclusion in my brief, I offered the court a set of facts that would bring this case within the scope of coverage, and that was the example that I just gave, and all the cases, the threshold, the minimal, that's the word used in West End, minimal threshold to give rise to a duty to defend, is are there any possible set of facts that could give rise to coverage, and there's a lack of duty to defend only where you cannot possibly come up with facts that would give rise to coverage. You contend you satisfied the general rule showing that the allegations contain facts potentially within the coverage. Correct, and that's a minimal threshold, West End versus Sunrise, and absent absolute clarity on the face of the complaint, that's no value. Absent absolute clarity that there's not coverage, there is a duty to defend. But you don't think there's any difference? I mean, I was on Illinois, MSCO or whatever it's called, so I'm kind of in a wave box, but I think counsel is also distinguished that when you're dealing with a specific deal on a specific entity, you need where and when, and counsel over justice over here has said you don't have it. Well, I do have it. You're correct. It doesn't identify the location, but it doesn't exclude any locations, and what should have happened is that there should have been a defense offered, and then we would have determined the defense, I'm sure, would have been vigorous, and these facts would have come to light. Well, both sides are agreeing that whoever that attorney was, he doesn't belong here. Well, if you say that, and I agree with you, but if you say that, then I think the natural next inductive leap there is that the trial court needs to be affirmed, because you're right. He shouldn't have told the insurance company you don't need to defend. He should have told the insurance company you do need to defend, because I can read this complaint and come up. I'm looking at your policy. You've got 15 places. I'm looking at the complaint. It says you were bad when you prepared it. It says you were bad when you stored it and warehoused it and processed it, and yes, the transaction, the final thing, going from one person to the next, occurred in Oak Brook, but all these other things, prior to March 28, 2006, could have occurred here. You didn't rely simply on the last aspect of your allegations of it being sold at this location. You said it was designed, processed, distributed, warehoused, et cetera, and or sold. Correct. That was just one of the alternatives. That was one of a series of negligent acts and or omissions. There's a number of them alleged, and nowhere does the complaint limit those acts or omissions to the location. In fact, I think your observation that the final act occurs in DuPage County lends itself to, well, the allegations must be broader. Why else is it broad in Cook County? Well, it was broad in Cook County because you stated that the restaurant was located in Cook County, which I don't think is correct. Oh. Yeah. I don't. Yeah. I mean, say it was me, right? But you might be in the second district arguing this thing. Oh, well. Do you feel safer here? I'd rather not be here, so. You know, well, I'm based in Cook County. Let me just ask you this, and we're wrapping up here with you, but there's a suggestion that the complaint could be an act of under pleading, that it was artfully pled. And the occurrence here happened in March of 06. The complaint was filed in July of 07, so a lot of time passed. Was this deliberately under pled by you? I'm glad you asked, because I did notice those suggestions. No. Okay. To suggest that I had that sort of clairvoyance, I mean, you might see it on late-night TV, but I promise you when I'm writing the complaint. Well, we don't know what happened when you sent your attorney's lien to residents if you had one, or we don't know if you had any correspondence with any insurance company or the owners or anything else. All we know is what's in this complaint, so. Just throwing up a little softball here to ask you whether or not you deliberately under pled. No, I didn't. I didn't under plead, and the last, it never, it was never a fact known to me, and I never sat down and thought, okay, well, there's only, I had no idea. I had no idea what was covered, what wasn't. I just put together the complaint as I did, and no, there was no intent. And I didn't, after the fact, look and make sure and maybe ask for leave to amend, like you said, which would have been ex parte because nobody else was on the other side, to make sure. I didn't do it, Lorton v. Ball, because I didn't know about any of this actually until I, when I filed a citation to discover assets on residents, and that's when I learned of the existence of the policy. I mean, I figured that they probably were insured and that I might find out about that, or if they were insured, maybe they had property or whatever, but that's when I found out about it, when I was advised by their company. And you certainly knew it by the time you entered into the assignment, right before the two-year statute of limitations. Sure. Well, neither of us wanted to expend money. I had to sue them because, if I remember correctly, I don't remember. I think that the concern was that I might have to sue them, but I don't remember the exact nature of that. Okay. Thank you. Thank you very much. Thank you. Justice Lavin, you stated, quote, All we know is what is alleged in the complaint, close quote. That's all we need to know. That is the touchstone for the analysis when it's read in the light of what's in the insurance policy. The complaint is what it is, you also said, and it clearly is not a model of clarity with all due respect to Mr. Frederick. What do you stand to say? Paragraph 5 alleges that on and prior to March 28, 2006, plaintiff Nancy Lorenzo, while consuming the aforementioned food, was injured. Well, she wasn't injured on and prior to that date. She was injured on that date. The on and prior is temporal. It is not geographic. And that allegation as to when she ate this chicken that made her sick is really contrived and wrong, and probably in hindsight being 20-20 vision, you take out the words and prior to and just make it that on March 28, she ate the chicken and got sick. Now, when you read this complaint, and all we know is what's in the complaint from Justice Lavin, all we know is one location, 40 North Teller Road. You don't know if they have one other location or if they have 15 other locations and what they do at those locations, and frankly, it's irrelevant. Because this plaintiff chose to plead that this occurred at this one location on this date and time. And what they did prior to that with respect to storing, designing, manufacturing, and selling the chicken is really not important because the complaint speaks to only one location, 40 North Teller Road in Oakbrook, which is unmistakably DuPage County, but the pleader called it Cook. We have a situation here where when I told the appellate court, 4th District in Chandler, change the law. Everybody knows what was involved here. They responded at page 805 of 299 L.S. 30. So then I was clear on the subject. We decline American Fire's invitation to change the law. The argument there was everybody knew what car he was driving and everybody knows the car's not covered. The court said, it doesn't matter. The court says, first, we do not recognize the legal efficacy of an argument suggesting everyone knew something when the very purpose of some litigation is to resolve a dispute over who knew what and whether what they thought they knew was actually true. And then they held the tort claim. They had no idea what the covered situation was. And they held that Illinois courts have consistently determined the tort claimant in an underlying action is a necessary party to a declaratory judgment suit in whose absence complete relief cannot be given. So that Verna Chandler had a say in the coverage issue. Nancy Lorenzo has a say in the coverage issue. Nancy Lorenzo, however, built the box. She built the box where the allegations are found. You can't go outside the box. You can't go beyond the policy. There's an endorsement that limits coverage to a scheduled location. The trial court said it's not there. He should have stopped, which is what, again, we're asking this court to do. This is not Chandler. This is not an unjustified refusal to defend. This is a justified refusal to defend because when reading this complaint, you only get one conclusion. Forty North Tower Road in Oak Grove, Cook County, Page County, it doesn't matter, one location where everything occurred, and you don't know where else things could have been. This is not Forty North Tower Road and any other place Reza's did business at that time. Any other thing that I could think of at that time, any other thing that happened anywhere Reza's did business. It could have been pledged that she bought chicken at Reza's restaurant. Reza's has multiple locations where they store, manufacture, design, process, sell, and take chicken for the consumer. And she bought it at one of those locations. Then the insurance company would have to sit and scratch its head there. Where did she buy this chicken? Is it covered or not? Then we have that would be an unjustified refusal to defend because you can't tell on the face of the complaint where anything occurred, which is not the situation here. You cannot deny that what is alleged is only limited to Forty North Tower Road. And for those reasons, we would suggest the trial court was wrong. The reasons the trial court gave, although they're longings, when this court does its de novo review, aren't binding on this court. That's de novo review. You sit as three motion judges to determine, was this trial court correct? I submit to you that upon your review, when you do it the right way, not an ambiguity found in a pleading construed against an insurer. And there is no case in Illinois, and hopefully this won't be the first, that says that's the law, that you'll recognize the ambiguity is to be in the policy. And here the court said, and counsel doesn't contest it, that the policy is unambiguous. Unambiguous and an excluded location should have resulted in a judgment for the insurer, which is what we ask this court to do. Thank you. Thank you very much.